Filed 5/15/26  P. v. Andrews CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H052713 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C2003698) |
| v. | |
| THOMAS JOSEPH ANDREWS, | |
| Defendant and Appellant. | |

This appeal arises from a denial of an application for mental health diversion. Defendant and appellant Thomas Joseph Andrews argues that the trial court erred in finding that he would pose an unreasonable risk of danger to public safety if treated in the community.  We conclude that the trial court's decision was supported by substantial evidence—in particular, the evidence that Andrews had accumulated a vast quantity of firearms and ammunition, coupled with the statement that he had planned a potential mass casualty event "for years."  Although there was evidence to indicate that Andrews was willing and able to respond favorably to mental health treatment, we cannot conclude that the trial court's decision to weigh the evidence as it did was an abuse of discretion. Accordingly, we affirm.

## I.    BACKGROUND[1]

### A.    *The March 1, 2020 Incident*

Andrews worked as a manager for United Parcel Service, Inc. (UPS) in Sunnyvale, California.  On March 1, 2020, he sent a series of threatening text messages to two groups of employees at UPS—one group with 20 employees and the other with 25 employees.  Among the many messages he sent were: (1) a photograph of himself in front of the Sunnyvale UPS facility playing the song "Murder on My Mind" by YNW Melly; (2) a text stating, "I am capable of incredibly horrific acts in defense of those that I love."; (3) a picture of a UPS logo with a black mourning band across it; (4) a photograph of a freshly skinned and bleeding animal skull; (5) a video clip of the "King Kong ain[']t got shit on me" scene from the movie "Training Day"; (6) a video clip of "I'm not fucking leaving" from "The Wolf of Wall Street"; (7) a video clip of the boardroom massacre scene from "Dogma"; (8) a music video for the song "Revenge" by Joyner Lucas; and (9) maps and directions to the UPS San Francisco facility (San Bruno Avenue) where a previous shooting had occurred.  Andrews also included Google searches for the Chief Executive Officer of UPS and various UPS office locations, as well as screenshots of the home address of one of his previous supervisors at UPS, Ryan Flynn.

Late in the evening, at 11:13 p.m., Sunnyvale Police Department officers identified Andrews's car and pursued him, during which Andrews did not immediately pull over and instead streamed a Facebook Live video for a little over 20 minutes. During the video, he stated, "So this is how it ends," spoke in rhyme "for almost the entirety of [the] 20 minutes," discussed employee compensation at UPS, mentioned local

---

[1] Because Andrews ultimately resolved his case with a no contest plea, we take the facts from the preliminary examination hearing and the diversion hearing, the documents addressed at these hearings, as well as the briefing on a bail motion and motion to suppress.

media personalities, and made random references to the then-quarterback of the San Francisco 49ers. Upon his arrest, he displayed an "aggressive demeanor … clenching his fists while he was seated," made "nonsensical statements," and cried "on and off."

It turns out that a couple of days before he sent the text messages, on February 28, 2020, Andrews had attended an "all-hands" office conference call with a "division president" of UPS, during which others observed him sound "different," interrupt the president, and make an unsolicited comment about Flynn (i.e., "Ryan Flynn, pay attention"). He was "reprimanded" and "scolded" by senior UPS personnel for his interruption. On February 29, 2020, Andrews texted a co-worker making further derogatory comments regarding Flynn.

On March 2, 2020, the police executed a search warrant at Andrews's residence, which uncovered approximately 20,000 rounds of ammunition and various firearms, including rifles, a shotgun, and handguns. During the search, police also discovered a "Kabar-style" hunting knife, a ballistic vest, a canister of "Tannerit[e]," which is an explosive shooting target, and tactical-style backpacks. One of the backpacks was located near the dining area, and one was near the exterior of a storage shed. Both backpacks contained ammunition, and the backpack near the shed also contained a partially disassembled rifle. The following pictures show a portion of the firearms and ammunition that were found:



4



The Santa Clara County District Attorney's office filed a criminal complaint against Andrews on March 4, 2020, listing 25 counts for making criminal threats, possession of assault weapons, possession of materials with the intent to make a destructive device or explosive, and reckless driving while evading arrest. On August 5, 2020, after a preliminary examination, the District Attorney's office filed an information charging Andrews with five counts of criminal threats (Pen. Code, § 422, subd. (a)), two counts of possession of an assault weapon (Pen. Code, § 30605, subd. (a)), one count of possession of a short-barreled rifle (Pen. Code, § 33210), and one count of reckless driving (Veh. Code, § 2800.2, subd. (a).)

5

**B.** *The Mental Health Diversion Application*

Andrews filed an application for mental health diversion on February 22, 2023. He claimed that his involvement in the criminal legal system resulted from bipolar disorder involving both mania and depression, combined with substance use. Andrews underwent two psychological evaluations, one by Dr. Brent Hughey and one by Dr. Carolyn Murphy. Hughey interviewed Andrews in March 2020 and summarized Andrews's psychological status as including bipolar type I disorder and a history of multiple substance use. Hughey recommended comprehensive mental health involvement and ongoing mental health services.

Murphy evaluated Andrews on January 27, 2021. She observed that Andrews's behavior was consistent with bipolar mania, and she noted the need for Andrews to maintain sobriety to prevent a return of manic symptoms. Murphy concluded that Andrews would not pose an unreasonable risk of danger to public safety if treated in the community because he did not have a history of significant hands-on violence and was in remission—but she also stated this would need to be re-evaluated biannually throughout his treatment. As a preface to the risk assessment in her report, she noted that "it is usually not possible to confidently predict dangerous behavior in individual cases, as research is based upon group norms that individual test scores are compared to."

While the present case was still pending, Andrews committed new criminal offenses after the evaluations. In the first incident, on March 7, 2022, police contacted Andrews after a report of a discharged firearm. Although no firearm was found, Andrews was confrontational with the police and the situation escalated to the point where he was placed on an overnight hold under Welfare and Institutions Code section 5150 (5150 hold). In another instance on May 3, 2022, Andrews had not taken his medication, was drinking alcohol, and was found behaving erratically. He scratched the hood of a car, damaged its spoiler, and again resisted officers as they initiated a

6

subsequent 5150 hold. In another incident, Andrews threw an unknown substance at a nurse at the county jail on May 21, 2022 and was charged with misdemeanor battery. In a fourth incident on October 7, 2022, Andrews behaved erratically in a 7-Eleven store, screaming expletives, taking a bite out of a banana, throwing it at the clerk, and demanding a pack of "Swisher Sweets" cigarillos without paying for them. Earlier that same day, he had reportedly defecated on a neighbor's porch and vandalized his girlfriend's apartment. He was again placed on a 5150 hold. He was charged with assault and petty theft.

On December 15, 2022, Murphy conducted an updated evaluation of Andrews. She noted that his inconsistent use of his medication had led to a return of symptoms of mania, which in turn led to increased alcohol and cannabis use and a "full decompensation." Murphy again stated that Andrews would not pose an unreasonable risk of danger to public safety if treated in the community, but qualified this assessment by emphasizing that "he must remain treatment compliant and sober" and that intensive treatment was necessary to prevent violence in the future.

C.     *The Diversion Hearing*

The trial court held a hearing on the mental health diversion application on two dates in April 2023. On April 4, 2023, the court heard arguments from counsel, as well as supporting statements from Andrews's brother, girlfriend, and three co-workers. They described Andrews as loving, caring, intelligent, loyal, hardworking, kind, funny, and charismatic. His girlfriend, who had known him for 15 years, said she did not recognize Andrews during the March 1, 2020 episode. The prosecution opposed granting diversion, arguing that Andrews was neither eligible nor suitable for diversion, particularly given the risk to public safety. On April 18, 2023, the court heard additional arguments from counsel, with the prosecution continuing to oppose diversion. The trial court ultimately denied the application.

7

The court stated that the most important factor in making its determination was whether Andrews posed an unreasonable risk to public safety, including the risk that he would commit a "super strike" offense.[2]  The court acknowledged that its discretion was limited by the requirement that there be a risk of a super strike, not just any general crime.  Nevertheless, it concluded that there was "an abundance of evidence that is very strong," referring to the texts sent by Andrews on March 1, 2020.  The court found especially concerning a statement by Andrews "that translates to something like, boy, it sounds corny but I've planned this for years.  Didn't know how or why or when the opportunity would come but when it did I'd strike."  After summarizing more evidence, the court concluded that Andrews "poses an unreasonable risk for public safety in our community, as I do believe it's likely he could commit a super strike."

Following the denial of diversion, the trial court ordered Andrews to be released according to a plan that had been prepared by a licensed clinical social worker for the County of Santa Clara.  Andrews would attend treatment programs, including the Muriel Wright Crisis Residential Treatment program, the Muriel Wright Substance Use Treatment Services program, and the Gardner Full Service Partnership mental health treatment program.

In September 2024, Andrews agreed to plead no contest to a misdemeanor charge of making criminal threats and a felony charge of possession of an assault weapon.  The latter charge was reduced at the time of sentencing to a misdemeanor under Penal Code

---

[2] A "super strike" refers to a subset of "strike" offenses (i.e., serious or violent felonies) that are subject to stricter sentencing.  They are set forth in Penal Code section 667, subdivision (e)(2)(C)(iv) and include " 'murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14.' [Citation.]" (*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679.)

section 17.  The trial court suspended imposition of sentence and sentenced Andrews to one year of probation with a condition of one year in the county jail with credit for time served, along with a 10-year firearm restriction.

Andrews timely appealed.

## II.  DISCUSSION

### A.  *Governing Law and Standard of Review*

Rather than face a potential conviction and sentencing, criminal defendants in California may under certain statutory circumstances be eligible for pretrial diversion. "In June 2018, the Legislature enacted Penal Code sections 1001.35 and 1001.36, which created a pretrial diversion program for certain defendants with mental health disorders. [Citation.]" (*People v. Frahs* (2020) 9 Cal.5th 618, 624, fn. omitted.)  The purpose of the program is to promote:  "(a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.  [¶]  (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.  [¶]  (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."  (Pen. Code, § 1001.35.)

In exercising its discretion to grant pretrial diversion, a trial court must determine both the eligibility and the suitability for the program by the defendant.  Two criteria must be met for eligibility: (1) "[t]he defendant has been diagnosed with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders," and (2) "[t]he defendant's mental disorder was a significant factor in the commission of the charged offense."  (Pen. Code, § 1001.36, subd. (b).)  If the eligibility requirements are satisfied, the trial court then considers whether all four of the following criteria for suitability are met:  (1) "In the opinion of a qualified mental health

9

expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment"; (2) "The defendant consents to diversion and waives the defendant's right to a speedy trial"; (3) "The defendant agrees to comply with treatment as a condition of diversion"; and (4) "The defendant will not pose an unreasonable risk of danger to public safety … if treated in the community." (Pen. Code, § 1001.36, subd. (c).)

Even if all requirements are met, however, "diversion under section 1001.36 is discretionary." (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080.) The trial court's " 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' [Citations.]" (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892.)

"We review a trial court's ruling on a petition for pretrial mental health diversion for abuse of discretion. [Citations.] 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation].' [Citation.]" (*People v. Graham* (2024) 102 Cal.App.5th 787, 795 (*Graham*).) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' [Citation.] However, '[a] reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork; a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence.' [Citation.]" (*People v. Grant* (2020) 57 Cal.App.5th 323, 330.)

**B.**      ***Whether Substantial Evidence Supports the Trial Court's Order***

The only disputed factor on appeal is whether Andrews poses an unreasonable risk of danger to public safety if treated in the community. The trial court found that Andrews met all of the eligibility and suitability requirements for diversion, except for

10

this fourth suitability factor. "Whether a defendant would pose an 'unreasonable risk of danger to public safety' is analyzed employing the definition of that term found in [Penal Code] section 1170.18. [Citation.] Under section 1170.18, an ' "unreasonable risk of danger to public safety" ' is 'an unreasonable risk that the petitioner will commit a new violent [super strike].' [Citation.]" (*Graham*, *supra*, 102 Cal.App.5th at pp. 798-799.) When making a determination regarding this factor, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (Pen. Code, § 1001.36, subd. (c)(4).)

Andrews argues that the evidence "indicates a likelihood that [he] will *not* commit a new 'super strike' offense." He claims that the only evidence relied on by the trial court was his behavior on March 1, 2020, and it was only speculation that Andrews might commit a new super strike offense after that date.

### 1.    Applicable Case Law

In making this argument, Andrews relies on several recent cases addressing mental health diversion: *People v. Whitmill* (2022) 86 Cal.App.5th 1138 (*Whitmill*), *People v. Moine* (2021) 62 Cal.App.5th 440 (*Moine*), *People v. Williams* (2021) 63 Cal.App.5th 990 (*Williams*), and *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124 (*Vaughn*). In his reply brief, Andrews also focuses on *Siam v. Superior Court* (2026) 118 Cal.App.5th 67 (*Siam*), a case that was decided between the filing of the respondent's brief and the reply brief in this appeal. These cases are all materially distinguishable.

In *Whitmill*, the defendant was charged with unlawful possession of a firearm, discharge of a firearm with gross negligence, and criminal threats after he fired a shot into the air and said, "Don't walk up on me," when another individual approached. (See *Whitmill*, *supra*, 86 Cal.App.5th at pp. 1142-1144.) Although the trial court found that

11

the defendant posed an unreasonable risk of danger to public safety if treated in the community, the appellate court reversed, holding that there was insufficient evidence to support a finding that the defendant was "likely to commit a super-strike offense." (*Id.* at pp. 1150-1151.) The Court of Appeal noted that the defendant's record did not include any violent crimes, and "it [was] significant that the facts of this incident include[d] appellant running away from further confrontation, throwing away his firearm, and peacefully complying with law enforcement's request that he come forward and (presumably) be arrested." (*Id.* at pp. 1147, 1151.) The court also noted that the expert testimony expressly concluded that defendant " '*would not pose an unreasonable risk of danger* to public safety if treated in the community and he abstains from substance abuse.' " (*Id.* at p. 1151.)

In *Moine*, the prosecution charged defendant with assault and making criminal threats in two separate incidents that occurred in the offices of two different medical care providers. (See *Moine*, *supra*, 62 Cal.App.5th at pp. 443-444.) In the first incident, the defendant got into a fistfight in the waiting room after he asked a staff member to turn off the television, and another patient disagreed with that request. (*Id.* at p. 444.) In the second incident, the defendant became upset over a new prescription and denial of a referral to a psychiatrist. (*Id.* at pp. 444-445.) He made a number of threatening statements, described as "ranting," including: "they are lucky I don't have my gun with me, otherwise I would kill everybody here," and "I am going to come in and kill everybody here." (*Id.* at p. 445.) Further testimony, however, established that he had stated, "If I had a gun." (*Ibid.*) The trial court denied the request for mental health diversion on the ground that the defendant had " 'engaged in acts of violence' " (*id.* at p. 447), but the Court of Appeal determined that this was not enough to find a risk that he would commit a super strike offense. The Court of Appeal found it significant that none of the defendant's past convictions involved a violent felony, and there was nothing in

12

the record suggesting the defendant was likely to commit such an offense in the future, including the absence of any evidence that defendant actually owned or had access to any guns. (*Moine*, *supra*, 62 Cal.App.5th at pp. 450-451, 445, fn. 2.)[3]

The defendant in *Williams* sent "thousands of vile and threatening e-mails" to a family who owned a local autobody shop. (See *Williams*, *supra*, 63 Cal.App.5th at pp. 993-994.) He also "posted disparaging flyers near the family's shop, signed them up for swinger clubs, prostitution and massage solicitation online forums, and wrote threatening e-mails to elected officials (a United States Senator and the President) using their e-mail address." (*Id*. at p. 994.) Relying on *Moine*, the appellate court reversed the trial court's denial of diversion, pointing out that none of defendant's offenses were super strikes, and highlighting that "he poses a low risk to public safety in the uncontroverted opinion of two mental health professionals, there is no evidence he owned, possessed or had access to any weapons (see *Moine*, *supra*, 62 Cal.App.5th at p. 445, fn. 2) and he, too, was released on bond for more than two years without incident." (*Williams*, *supra*, 63 Cal.App.5th at p. 1003.)

Though there is some overlap in the circumstances of *Whitmill*, *Moine*, and *Williams* and the present case, they are not ultimately on point. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts. [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Although the defendant in *Whitmill* had a gun, he ran away from further confrontation and peacefully complied with law enforcement's request that he come forward. (*Whitmill*, *supra*, 86 Cal.App.5th at p. 1151.) There is no indication that he had ever threatened to commit a super strike offense. Conversely, in *Moine* and

---

[3] The appeals court also noted that the trial court had released the defendant into the community on bond for more than two years, indicating the court "necessarily found that [the defendant] was not likely to cause 'great bodily harm to others' if released." (*Moine, supra,* 62 Cal.App.5th at p. 451.)

*Williams*, the defendants threatened to kill someone, but they had no apparent means of actually following through on those threats, as they had no access to firearms, much less any history of ever having handled firearms or any history of having committed violent felonies. (*Moine*, *supra*, 62 Cal.App.5th at pp. 445, 450-451, fn. 2; *Williams*, *supra*, 63 Cal.App.5th at p. 1003.) These were empty threats. In the present case, by contrast, Andrews made numerous statements that, taken together, were indicative of a plan to cause a mass casualty event, combined with the capability of actually carrying out such a plan, in the form of a large cache of weapons, ammunition, and tactical equipment.

Regardless of whether we would find in the first instance that this evidence necessarily means that Andrews presented an unreasonable risk of committing a super strike offense if treated in the community, we cannot say as a matter of law that the foregoing evidence was insufficient for the trial court to make that finding. Under an abuse of discretion standard of review, "we may not substitute our judgment for that of the trial court." (*County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1457.) We do not reweigh the evidence and "instead must defer to the trial court's weighing of the evidence." (*People v. Brown* (2024) 101 Cal.App.5th 113, 123-124 (*Brown*).) " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; see also *Brown*, *supra*, 101 Cal.App.5th at p. 124 ["the existence of some evidence in support of either conclusion is not a sufficient basis for this court to supplant the findings of the trial court"].)

For similar reasons, Andrews's reliance on *Vaughn* and *Siam*, are unavailing. In *Vaughn*, the trial court found that even though the defendant may have satisfied all of the eligibility and suitability requirements for mental health diversion, it did not appear that the defendant was "serious enough" about diversion because he forgot to bring his

14

medication bottles to his psychological examination. (*Vaughn*, *supra*, 105 Cal.App.5th at p. 132.) The Court of Appeal reversed, determining that this was an inappropriate exercise of the trial court's residual discretion because it was inconsistent with the purpose of the mental health diversion law, and the "failure to bring … medications is not substantial evidence that supports the trial court's decision." (*Id.* at p. 136, 137-140.) *Vaughn* is inapposite and does not provide any insight into the application of the fourth suitability factor, the key question here.

As for *Siam*, this decision did address the fourth suitability factor, but nothing in the defendant's conduct in that case suggested that there was any risk of his committing a super strike offense, as he neither threatened to commit such an offense nor gave any indication that he could potentially commit such an offense. The defendant had hit a taxi driver in the back of the head with a skateboard in 2020, and he had commandeered a yacht and crashed it into other boats and a seawall in 2022. (*Siam*, *supra*, 118 Cal.App.5th at pp. 73-75.) While these crimes were certainly dangerous, causing physical injury and property damage, they still were not super strikes and were not indicative of any propensity to commit a super strike. In the words of the court, they were "not enough to support a finding he poses an *unreasonable* risk of committing a *super strike* when undergoing *proper* treatment, especially in light of his lack of a criminal record outside the two offenses and his general nonaggressive and nonviolent disposition." (*Id.* at p. 87.) These facts are plainly distinguishable from the present circumstances.

### 2. Additional Arguments by Andrews

Andrews stresses that none of his charged offenses—and none of his new offenses while this case was pending—were themselves super strikes, but this is not dispositive. A trial court's discretion is not limited to "offenders who have already committed a super strike offense." (*People v. Hall* (2016) 247 Cal.App.4th 1255, 1266.) As mentioned

15

above, Penal Code section 1001.36 specifies that in applying the fourth suitability factor, the trial court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, *and any other factors that the court deems appropriate*." (Pen. Code, § 1001.36, subd. (c)(4), italics added.) For the reasons already discussed, we consider the circumstances here—including that Andrews threatened to commit a super strike offense, stated that he had been planning it "for years," and had the arsenal to carry out his threats—to provide a sufficient basis for the trial court's decision.

Similarly, Andrews argues that this case ultimately boils down to his behavior on a single day—March 1, 2020—and "[t]here is no evidence in the record to support Mr. Andrews was at risk of committing a *new* super strike felony" after that date. This is not a fair characterization of the record. The evidence shows that Andrews had accumulated assault weapons, tens of thousands of rounds of ammunition, and tactical gear for a significant period of time before March 1, 2020. The trial court expressly noted its concern that Andrews had essentially admitted "years" of planning before he would find an opportunity to "strike." In addition, the record shows that even after Andrews began treatment, he relapsed after discontinuing consistent use of his medications, leading to new criminal offenses and hostile confrontations with law enforcement. In assessing the risk of future violent conduct by Andrews, the trial court was entitled to rely on both his pre-March 1, 2020 planning efforts and his post-March 1, 2020 failures to remain compliant with his treatment plan.

Finally, Andrews argues that the trial court implicitly acknowledged that he was unlikely to commit a super strike because it released him to treatment programs prior to his plea. We disagree that the trial court made any such implicit finding in light of its explicit finding that it believed "it's likely he could commit a super strike." Moreover, a

16

court's denial of pretrial diversion does not restrict it from employing other measures to address prevention and treatment. For example, courts have denied diversion while at the same time ordering supervised probation. (See *People v. Pacheco* (2022) 75 Cal.App.5th 207, 214 [affirming denial of mental health diversion and affirming release to a mental health facility as a condition of probation].) In this case, the trial court ordered that Andrews follow a recommended treatment plan at facilities that, although not locked, are supervised 24 hours a day. As a result, we find no internal inconsistency in the trial court's decision, and we find no inconsistency between our decision and *Moine*, which appeared to involve an unsupervised (or less-supervised) release "for a period of over two years." (*Moine*, *supra*, 62 Cal.App.5th at p. 451.)

We conclude that the evidence in the record is sufficient to support the trial court's order denying pretrial mental health diversion, and we find no abuse of discretion.

## III.    DISPOSITION

The trial court's order denying mental health diversion is affirmed.

17

_____

               CHUNG, J.*

WE CONCUR:

_____

GREENWOOD, P. J.

_____

DANNER, J.

*The People v. Andrews*
H052713

_____

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.